IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TONYA R. KELLER,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:26-cv-749<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Tonya Keller filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In November 2023, Keller filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of June 15, 2021.[1] Tr. 93, 242. In her applications, Keller claimed disability due to blindness or low vision, hypertension, pinched nerve in her back, chronic

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

arthritis, COPD, depression, and anxiety. Tr. 295. The Social Security Administration denied Keller's applications and her motion for reconsideration. Tr. 72, 73, 93, 104. Keller then requested a hearing before an Administrative Law Judge (ALJ). Tr. 140.

In April 2025, an ALJ held a hearing, during which Keller and a vocational expert testified. Tr. 41–67. The next month, the ALJ issued a written decision finding that Keller was not disabled. Tr. 17–33. The ALJ's decision became final on February 4, 2026, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Keller filed this action on March 30, 2026. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ erred when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider all Plaintiff's impairments and related limitations when forming the residual functional capacity evaluation.
>
> 2. The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

Doc. 8, at 1.

**Evidence**

*Personal and vocational evidence*

Keller was 51 years old on her alleged disability onset date. Tr. 291. She attended some college and used to work as a corrections officer and an outside deliverer. Tr. 47, 62.

*Relevant medical evidence*

In June 2021, Keller went to the emergency room for lower extremity weakness that resulted in a fall “from standing level.” Tr. 911. A lumbar MRI showed mild to moderate canal stenosis and left foraminal stenosis, Tr. 922, which, the provider stated, did not explain Keller’s symptoms, Tr. 924. Keller was assessed with proximal muscle weakness, Tr. 913, her symptoms resolved, and she was discharged, Tr. 930.

In August, Keller attended a primary care appointment and complained of low blood pressure. Tr. 902. The doctor assessed medication-induced hypotension and adjusted Keller’s medication. Tr. 903.

In September, Keller was admitted to Cleveland Clinic Akron General Hospital for a suicide attempt. Tr. 814–15. She was diagnosed with major depressive disorder and substance abuse disorder with alcohol. Tr. 815.

In October, Keller had a telemedicine appointment with her primary care provider and reported back pain. Tr. 811. The doctor prescribed Percocet and referred Keller to a pain management specialist. Tr. 813. A few days later, Keller returned to the doctor for right foot and ankle pain and swelling that

began three days before her visit. Tr. 808. By the time of her visit, the problem had resolved. Tr. 810.

Later that month, Keller saw a doctor to follow up on her pulmonary function test, and she complained of a cough. Tr. 803. The doctor assessed COPD and a cough. Tr. 803.

In November 2021, Keller was hospitalized for a suicide attempt. Tr. 692. She was assessed with major depressive disorder, severe, without psychotic features status post overdose; severe alcohol use disorder; generalized anxiety disorder; unspecified trauma related disorder; and rule out post-traumatic stress disorder. Tr. 739. The next day, Keller visited Portage Path Behavioral Health to establish care. Tr. 1568. She referenced her recent suicide attempt and indicated that she "[w]as drinking a fifth or more of vodka daily." Tr. 1568. Keller explained that she had returned to Ohio to care for her ailing parents and said that "everything was going well until her sister and son moved in to help," which caused familial stress. Tr. 1569.

In December, Keller advised her counselor that "mentally [she's] doing fine" and that her depression was manageable. Tr. 1562.

In January 2022, Keller established care at the spine and pain institute at Akron General and saw Kermit Fox, MD, for lower back pain that began "many years" earlier. Tr. 627. Keller explained that she used to live in Colorado, where she attended pain management. Tr. 657. She said that at the time of her visit, her parents were in hospice and she was their primary

caretaker. Tr. 627. On exam, Keller had decreased lumbar range of motion, normal hip range of motion, and full, "5/5" strength in her lower extremities. Tr. 630–31. The doctor diagnosed lumbar spondylosis with radiculopathy, Tr. 631, and in February a doctor at the spine institute administered an epidural steroid injection, Tr. 616.

In early March 2022, Keller had a lumbar MRI, which showed "[i]ncreased endplate edema at L2/3 intervertebral disc since 6/2/2021"; multilevel degenerative changes with spinal canal stenosis most prominent at L2/3 and L3/4, rated mild to moderate; and neural foraminal stenosis, rated mild to moderate at L2 through L5 and severe at L5-S1.[2] Tr. 430–31. A few days later, Keller reported that the back injection did not help her pain. Tr. 608.

Later in March, Keller had an acupuncture appointment at the spine institute. Tr. 603. On exam, Keller had reduced lumbar spine range of motion

---

[2] Vertebrae in a person's spine are given letter and number designations according to their location. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

and tenderness. Tr. 604. She had intact sensation, motor function, and coordination. Tr. 604.

In May 2022, Keller fractured her foot. Tr. 592. She told Dr. Fox that her "legs suddenly became wobbly and her knees g[a]v[e] out on her," causing her to fall. Tr. 592. Dr. Fox wrote that this was "suspicious for lumbar spine origin." Tr. 592. Because of Keller's foot facture, a steroid back injection was postponed until the fracture had healed. Tr. 592.

In June 2022, Keller saw a primary care doctor and reported hand tremors and dizziness that began six months before her visit. Tr. 580. On exam, Keller had a "[s]ignificant tremor." Tr. 582. Her doctor observed that the tremor was consistent with alcohol withdrawal tremors, although Keller "sw[o]r[e] she hasn't had a drink in months." Tr. 585. The doctor prescribed propranolol to help with tremors. Tr. 585.

In July, Keller reported dizziness and falls. Tr. 569, 573. She reported having been diagnosed in the past with orthostatic hypotension—a sudden drop in blood pressure when standing up from a seated position. Tr. 573. The doctor assessed orthostatic hypotension, prescribed medication, and encouraged Keller to drink more water. Tr. 576. He also advised Keller to stop smoking, noting that otherwise Keller's medical conditions would worsen. Tr. 576. Keller reported that her tremors had improved with medication. Tr. 576. That month, Keller visited Portage Path and said that she was "doing pretty good" and that her anxiety was manageable. Tr. 1523.

In September 2022, Keller visited the emergency room for worsening lower back pain that radiated down her left leg. Tr. 534. On exam, Keller had tenderness in her lower back, positive straight leg raise testing, normal range of motion in her legs, and normal sensation and strength. Tr. 534.

In October, Keller visited the spine and pain institute for lower back pain with radicular symptoms in the left "L5 vs S1 dermatome," which was consistent with MRI findings showing foraminal stenosis. Tr. 525. The doctor wrote that Keller's lower back pain had been exasperated by having to walk in a boot for her fractured foot, but that at this time Keller's foot was fully healed and she no longer wore the boot. Tr. 525. On exam, Keller had reduced lumbar range of motion, full strength, and intact sensation. Tr. 531. Because her foot had fully healed, Tr. 525, Keller underwent another epidural steroid injection in her back in November, Tr. 510, which provided 50 percent relief, Tr. 489.

In December, Keller visited her primary care office regarding her tremors. Tr. 486. She reported that propranolol helped her tremors, but that they were still present. Tr. 486. The doctor continued Keller's medication and referred her to neurology. Tr. 488. That month, Keller visited Portage Path and said that she was "alright" and that a recent medication increase "produced favorable results." Tr. 1539.

In January 2023, Keller was hospitalized for syncope and a change in mental status. Tr. 437–39. Her discharge diagnoses included the following: syncope, hypertension, anxiety, COPD, and major depressive disorder. Tr. 480.

Later that month, Keller visited the spine institute for back pain. Tr. 428. On exam, she had a normal gait and full strength. Tr. 433. Because relief from the epidural injections lasted only a week, the doctor recommended medial branch blocks and, in the future, radiofrequency ablations. Tr. 433. Keller underwent medial branch blocks the following month, which, Keller reported four days later, provided 80 percent relief for three to four days. Tr. 417.

Meanwhile, in early February, Keller reported feeling "pretty good" and said that she was busy taking care of her parents, who were in hospice, and dealing with plumbing issues at home. Tr. 427. She had experienced no tremors or blackouts. Tr. 427.

In June 2023, Keller reported that her tremor had improved. Tr. 402. It was not present all the time. Tr. 402. Keller underwent lumbar medical branch blocks in May and July, but the 90 percent relief they provided was not sustained and she was ready to try radiofrequency ablations. Tr. 390–91.

In July, Keller visited Portage Path and reported increased anxiety due to her mother having passed away and her father being in hospice. Tr. 1514.

In September 2023, Keller reported to her chiropractor that she experienced lower back pain that she described as "sharp, aching, and

shooting." Tr. 384. In October, Keller saw her primary care doctor and reported back and elbow pain. Tr. 379.

In November, Keller's chiropractor observed that Keller had moderate to severe hypertonicity through the thoracic paraspinal muscles and gluteal muscles with pain and reduced range of motion. Tr. 374. That month Keller also underwent lumbar radiofrequency ablation and reported 80 percent relief. Tr. 1660. Afterwards, she reported that she tolerated and participated in her activities of daily living with less pain and difficulty. Tr. 1660.

In late November, Keller was evaluated at Portage Path. Tr. 1507. She reported physical problems and said that she took care of her father, who required 24-hour care. Tr. 1507. Keller reported difficulty sleeping and feeling jolted awake by adrenaline rushes throughout the night. Tr. 1507. She had back pain, which caused depression. Tr. 1507.

In January 2024, Keller attempted to overdose on her medication. Tr. 1692. Her mother had recently passed away and she was caring for her father. Tr. 1692. At the time of her visit, Keller "was not on her psychiatric medications." Tr. 1845. On exam, Keller was not cooperative and had suicidal thoughts. Tr. 1693. Later that month, Keller saw a counselor at Portage Path and resumed her medications. Tr. 1846.

Keller followed up with her doctor in February. Tr. 1905. She reported feeling better. Tr. 1906. The doctor assessed a severe episode of recurrent major depressive disorder and alcohol use disorder. Tr. 1907.

That month, Keller saw a nurse practitioner for a physical consultative exam. Tr. 1857. On exam, Keller had good hand-eye coordination, no balance problems, and a normal gait, although she walked with a limp and "lean[ed] to the left for comfort." Tr. 1860, 1864. She had normal sensation; positive straight-leg raise testing; normal reflexes; normal strength, except for her shoulder; and normal range of motion. Tr. 1860, 1861, 1863–67. Keller could "squat and rise from that position with ease," and could "rise from a sitting position with assistance and had some difficulty getting up and down from the exam table." Tr. 1860. She could walk on her heels and toes "but loses her balance." Tr. 1860.

In May 2024, Keller followed up with Dr. Fox at the spine and pain institute. Tr. 2060. She complained of lower back pain and reported 80 percent relief for one month from the lumbar radiofrequency ablation. Tr. 2061. In June, Keller underwent an epidural steroid injection at L2-L3. Tr. 2096. In July, Keller reported that her "overall pain and functional disability since [her] last visit" was "[b]etter." Tr. 2123. She said that the epidural injection provided 30 percent pain relief. Tr. 2123.

Later that month, Keller was hospitalized due to alcohol-induced suicidal ideation. Tr. 2113. She indicated that both of her parents had died. Tr. 2113.

*Function report*

In December 2023, Keller completed a Function Report. Tr. 302–09. Keller wrote that due to back pain, it was very hard and painful to bend, sit, walk, and pick up anything over five pounds. Tr. 302. She had a hard time showering. Tr. 302. Due to high blood pressure, she felt dizzy and light-headed when she stood up. Tr. 302. Her father, who at the time was still alive, was bedridden and she assisted him with his daily needs, made meals, and did laundry. Tr. 303. Regarding her personal care, Keller wrote that it was hard for her to bend to get dressed and she did not brush her hair due to pain. Tr. 303. She used a towel rack to assist her when using the toilet. Tr. 303. Keller stated that she had lost contact with friends because she did not want to leave her house. Tr. 308.

*State agency opinions*[3]

In March 2024, Acacelis Rivera Castro, PsyD, reviewed Keller's record. Regarding Keller's residual functional capacity,[4] Dr. Castro found that Keller

---

[3] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4] A residual functional capacity, or "RFC," is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20

could work "with a small group of familiar coworkers in a less public setting where feedback is constructive." Tr. 81. She could "adapt and manage in a structured and predicable work setting where changes can be explained." Tr. 81. The same month, Steve McKee, MD, reviewed Keller's record and found that Keller could perform light exertional work—stand, walk, and sit for six hours in an eight-hour workday, and lift 20 pounds occasionally and 10 pounds frequently—with postural and environmental limitations. Tr. 79–80.

In August 2024, Jeannine Abbott, PhD, agreed with Dr. Rivera's findings, Tr. 101, and Leon Hughes, MD, agreed with Dr. McKee's findings, Tr. 99–100.

*Hearing testimony*

Keller, who was represented by counsel, testified at the telephonic administrative hearing. Keller stated that she applied for disability in June 2021 because she started having episodes of lightheadedness and her legs would give out. Tr. 51. Since then, her back issues have gotten worse, and she had a hard time walking. Tr. 51. Keller explained that she experiences pain, walks with a limp, and leans to the left while standing and walking. Tr. 51–52. She said that she could sit for about 15 minutes before her back starts to spasm, and she has to lie down for about an hour. Tr. 52. She could stand for about 10 minutes before her left leg went numb, and she could walk for about

---

C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

15 minutes. Tr. 52–53. Keller received three back injections, but they only helped the pain for a couple of days. Tr. 52, 58. She also takes medication for pain. Tr. 52, 58.

Keller stated that, for her mental health, she takes medication and attends weekly counseling. Tr. 52. This treatment helped "for the most part." Tr. 52. Keller said that she still used alcohol "but not as much." Tr. 54. She explained that she drank less frequently, although when she did drink, she drank "like a six pack." Tr. 54–55. When asked if she attended AA meetings, Keller said that she did not because she can't leave her house due to anxiety. Tr. 54. She speaks to her AA sponsor about once a week on the phone, which helps. Tr. 54.

The ALJ discussed with the vocational expert Keller's past work as a corrections officer and outside deliverer. Tr. 61–62. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Keller could perform her past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 62–63. The vocational expert answered that such an individual could not perform Keller's past work but could perform the following jobs: cleaner housekeeper, inspector hand packager, and mail clerk. Tr. 62–63.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2024.
>
> 2. The claimant has not engaged in substantial gainful activity since June 15, 2021, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 3. Since the alleged onset date of disability, June 15, 2021, the claimant has had the following severe impairments: alcohol abuse; anxiety; depression; chronic obstructive pulmonary disease (COPD); lumbar radiculopathy; hypertension (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. Since June 15, 2021, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that since June 15, 2021, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional restrictions. Specifically, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently, and lift and/or carry as much as she can lift and/or pull; she can frequently climb ramps and stairs but occasionally climb ladders, ropes or scaffolds; she can frequently stoop, kneel, crouch, and crawl; she can never work at unprotected heights or with moving mechanical parts; she can have frequent exposure to dust, odors, fumes and pulmonary irritants; she can occasionally interact with supervisors and coworkers but never with the

public; and, she can tolerate occasional changes in the work setting.

6. Since June 15, 2021, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. Applying the age categories non-mechanically, and considering the additional adversities in this case, on April 22, 2025, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Prior to April 22, 2025, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on April 22, 2025, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Prior to April 22, 2025, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on April 22, 2025, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

> 12. The claimant was not disabled prior to April 22, 2025, but became disabled on that date and has continued to be disabled through the date of this decision. Her disability is expected to last twelve months past the onset date (20 CFR 404.1520(g) and 416.920(g)).
>
> 13. The claimant was not under a disability within the meaning of the Social Security Act at any time through June 30, 2024, the date last insured (20 CFR 404.315(a) and 404.320(b)).
>
> 14. The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).

Tr. 20–33.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of

impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has

made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when she evaluated Keller's hand tremors*

Keller argues that the ALJ "failed to properly apply the criteria of Social Security Ruling 96-8p and consider all [Keller's] impairments and related limitations when formulating the [RFC]." Doc. 8, at 9; *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *5 (Jul. 2, 1996) (when assessing the RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Specifically, Keller contends that the ALJ erred at step two when she found that Keller's hand tremors were not severe, and that they did not cause Keller to have difficulties functioning. Doc. 8, at 13.

In her decision, the ALJ acknowledged that Social Security Ruling 96-8p controlled. Tr. 19 ("In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe") (citing the regulations and SSR 96-8p). The ALJ also wrote that when assessing the RFC, she "careful[ly] consider[ed] … the entire record" and "all symptoms." Tr. 23–24. And at step two, the ALJ discussed the evidence regarding Keller's hand tremors; explained that Keller's tremors are non-severe because they imposed no more than minimal limitations when properly treated; and advised that the ALJ nevertheless "has still considered any limitations caused by such [non-severe] impairments, along with those more attributable to the severe impairments, in determining the [RFC] set forth

below." Tr. 21. In other words, the ALJ acknowledged that Social Security Ruling 96-8p controlled; stated that she considered the entire record when assessing the RFC; and discussed whether there were functional limitations imposed by Keller's hand tremors at step two. All of these statements are sufficient to show that the ALJ complied with Social Security Ruling 96-8p. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851–52 (6th Cir. 2020) (finding that the ALJ did not err: "[a]lthough the ALJ did not specifically discuss the combined effect of Emard's impairments or mention Emard's nonsevere impairments in assessing his [RFC], she stated that she had carefully considered the entire record and 'all symptoms' at this step in the process," "ma[d]e[] clear that her decision is controlled by SSR 96-8p," and discussed any "functional limitations imposed by Emard's nonsevere impairments at step two of her analysis.").

Moreover, when explaining the RFC finding, the ALJ referenced Keller's hand tremors. Tr. 29 (citing Tr. 2020, an April 2024 counseling note in which Keller told the provider that she had been sober for five days and experienced "tremors from withdrawal"). So the ALJ expressly considered Keller's hand tremors when evaluating the RFC. *See Emard*, 953 F.3d at 852 ("'[T]he fact that some of [a claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant' where other impairments are found to be severe"' and "[a]n erroneous finding of nonseverity at step two is therefore harmless where the ALJ properly considers nonsevere impairments at later steps")

(citing *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008), and *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Keller summarizes some of the medical evidence and argues that the ALJ erred at step two when she found that Keller's hand tremors were not severe. Doc. 8, at 10–13. At step two, the ALJ explained:

> Throughout the records, the claimant also complains of tremors in her hands, which have been observed by providers (1F:218). In June 2022, the examining provider noted that it appeared to be consistent with alcohol withdrawal tremors, although the claimant reported not having a drink in months (1F:223). She was prescribed medication, which improved her symptoms (1F:214, 124). During a subsequent neurologic evaluation for the tremors, the examination did not reveal significant findings, including an MRI and CT scan of the brain. Furthermore, the neurologist noted that the tremors were inconsistent throughout the exam. (*See* 1F:97, 104-105, 111). In early 2023 her tremor was again noted to have improved as it 'comes and goes' (1F:40). Overall, while the tremor is frequently noted throughout the record, it was generally controlled with prescribed medication and did not cause the claimant significant difficulties as there are no documented complaints of difficulty functioning.

Tr. 21.

Keller submits that the ALJ's "conclusion was in error and was not supported by the medical evidence which demonstrated that [Keller] was diagnosed with an essential tremor as of December 6, 2022." Doc. 8, at 13. But "[t]he mere diagnosis of [a condition] … says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see Baker v.*

*Colvin*, No. 1:15-cv-910, 2016 WL 4128435, at *13 (N.D. Ohio Aug. 3, 2016) ("a diagnosis alone does not establish that a condition is disabling, nor does it establish the extent, if any, of the functional limitations caused by the condition."). The fact that Keller was diagnosed with essential tremors does not show that the ALJ erred when she evaluated Keller's hand tremors.

Next, Keller summarizes the evidence related to her hand tremors, most of which she did not include in the *Facts* section of her brief. *See* Doc. 8, at 13 (citing, e.g., Tr. 401, a June 2023 visit indicating Keller was diagnosed with essential tremor as well as "jerking movements of extremities"). Keller's reliance on facts not included in the *Facts* section of her brief is in violation of this Court's initial Order. *See* Doc. 4, at 3–4 ("Any facts recited in support of the *Argument* or *Analysis* section of a brief must also be set forth in the *Facts* section of the brief. The Court will not consider facts referenced in a party's argument unless those facts have been set out in the *Facts* section of the party's brief."). Keller's counsel has been warned about this time and time again. *See, e.g., Ennis-Hastings v. Comm'r of Soc. Sec.*, No. 1:23-cv-228, 2023 WL 7018361, at *8 (N.D. Ohio Sept. 19, 2023) ("Ennis-Hastings's counsel has been previously and repeatedly warned about this practice [of discussing facts in the *Argument* section that were not included in the *Facts* section of the brief]") (citing cases), *report and recommendation adopted*, 2023 WL 7282843 (N.D. Ohio Nov. 3, 2023). Keller's argument relying on facts that she did not include in the *Facts* section of her brief is therefore forfeited. *See id.*

Even if the Court were to consider the facts that Keller improperly presented, Keller's argument would fail. For instance, at the June 2023 visit, Keller told Dr. Keating that her tremors had improved; "[p]reviously she was not willing to do any workup"; and she was "[d]rinking a handle of tequila in about 2 days." Tr. 402. This evidence does not undercut the ALJ's conclusion that the severity of Keller's tremors improved with medication and it is consistent with alcohol withdrawal-related tremors the ALJ cited elsewhere in the record. Keller says that at a January 2024 psychiatry consultation, she "was observed with a notable bilateral hand tremor." Doc. 8, at 14 (citing Tr. 1758, dated January 23, 2024). This consultation occurred when Keller was discharged from a four-day hospital stay after an alcohol-related suicide attempt. Tr. 1694, 1710, 1711, 1753, 1758. Moreover, during her hospitalization, Keller advised that "Ativan helps attenuate these shakes." Tr. 1745. This psychiatry consultation evidence does not undercut the ALJ's conclusion. Finally, Keller cites a record from January 2023, showing that Keller had tremors in her arms that she told the provider were "worse." Doc. 8, at 13 (citing Tr. 449). But this treatment note also states that Keller had not followed up with neurology "as suggested," Tr. 449, and Keller concedes that by April, her tremors had improved after she stopped taking some of her medications. Doc. 8, at 13 (citing Tr. 412). Moreover, at this visit Keller again was "adamant" that she did not want to "follow up with neurology and complete[] the work up they recommended." Tr. 413.

Finally, Keller asserts that the tremors "limited the use of her upper extremities for fingering, feeling, and grasping." Doc. 8, at 14. She cites no evidence in support of this assertion. Keller did not testify at the hearing that she was limited by hand tremors, nor did she cite limitations from hand tremors in her function report. Tr. 43–67, 302–09. She has not shown that the ALJ erred when she evaluated Keller's hand tremors.

*2. The ALJ did not err when evaluating Keller's reports of symptoms*

Keller argues that the ALJ erred when she evaluated Keller's reports of symptoms. Doc. 8, at 15.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27,

2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

In support of her argument, Keller recites her testimony at the hearing and items in her function report regarding her reported limitations and her reports of lightheadedness, leg weakness and numbness, back pain and treatment, mental health treatment, alcohol use and treatment, anxiety, and breathing issues. Doc. 8, at 15–16. She then claims that this evidence is consistent with other evidence in the record, and summarizes evidence relevant to these problems. *Id.* at 17–19. Keller concludes, "both the objective tests, clinical findings, multiple hospitalizations, and treatment records documented [Keller's] impairments prior to her date last insured. This was corroborated by the testimony she provided. This evidence established that the ALJ's finding regarding the supportability of the testimony was not supported by substantial evidence requiring a remand of this matter." *Id.* at 20.

In her decision, the ALJ summarized Keller's hearing testimony and spent six pages detailing all of the medical evidence. Tr. 24–30. The ALJ concluded:

> The undersigned has considered the claimant's allegations and the medical evidence of record. Addressing the allegations to the extent reasonably supported by the record, the claimant is limited to light exertion work activities. A restriction regarding how much she can lift and carry is warranted by her ongoing low back pain as well as her shortness of breath with physical exertion. She does not require a limitation in standing or walking. Despite her allegations of being only able to stand or

> walk for a few minutes, the majority of the physical examinations in the record document a normal gait, full motor strength with no atrophy, and intact sensation, suggesting no significant limitation in standing or walking. The back pain also supports postural positioning restrictions based on diminished range of motion. Her exposure to workplace hazards is restricted to address her periodically noted syncope (although her symptoms resolved with modifications to her medications) as well as her subjective reports of numbness in her lower extremity and further allows for a periodically noted limp in order to ensure safety in the workplace. The claimant's mental health conditions have resulted in limitations primarily in her ability to interact with others and the ability to adapt or manage herself. The moderate limitations are supported by her routinely noted anxious and/or depressed mood, periodic irritability and/or anger, as well as her reports of isolation and anxiety leaving her home. Her difficulty coping is also consistently supported throughout the record as she has increased symptoms with increases in her life stressors, such as interpersonal issues at home, her parents' health, as well as the death of both parents. However, even during her most significant depressive periods, when she is intoxicated and overdoses on hypertension medication, the claimant is consistently able to understand, remember, and concentrate without significant limitation. To address her mental health allegations, as reasonably supported by the medical record, she is limited to no more than occasional interaction with supervisors and coworkers, no interaction with the public, and no more than occasional changes in her work setting.

Tr. 30. Keller has not indicated what about the ALJ's evaluation of her reports of pain, symptoms, and limitations she believes is erroneous. She has not shown that the ALJ erred.

Keller asserts that the ALJ "erred when she failed to account for

[Keller's] continuing pain when forming the RFC," Doc. 8, at 20–21, but the ALJ assessed limitations to account for Keller's pain, as shown above, Tr. 30. Keller recites law about what an ALJ must do when evaluating a claimant's symptoms, and asserts that the ALJ committed an error in this case. *Id.* at 21–23. But she hasn't pointed to anything in the ALJ's decision that she believes was erroneous. In short, Keller has not shown that the ALJ erred when she evaluated Keller's reports of symptoms.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

So ordered.

Dated: October 19, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge